**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| WILLIAM ASHBROOK, : | |
| : | |
| Plaintiff, : | Case No. C2-06-140 |
| : | |
| v. : | |
| : | JUDGE MARBLEY |
| OFFICER JOSH BOUDINOT, *et al.*, : | Magistrate Judge Abel |
| : | |
| Defendants. : | |

**OPINION & ORDER**

**I.  INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment.  Plaintiff William Ashbrook sued police officers Josh Boudinot and Marvin Gifford ("collectively Defendants") for excessive force under 42 U.S.C. § 1983 and assault under state law.  For the reasons set forth below, the Court **GRANTS** Defendants' Motion for Summary Judgment.

**II.  BACKGROUND**

The facts of this case are not in dispute because video cameras in the police cruiser and at the police station captured all of the alleged misconduct.  At approximately 2:00 a.m. on February 25, 2005, Sergeant Boudinot was patrolling the Village of Johnstown, Ohio, when he observed a vehicle almost strike a parked car.  Soon thereafter, he called for backup and switched on his cruiser's lights and sirens.  Ashbrook, the driver, was intoxicated and did not pull over.  A pursuit ensued during which Ashbrook veered into the oncoming lane, barely avoided a guard rail, and almost collided with Sergeant Boudinot's cruiser.  Two-and-a-half minutes into the low-speed chase, Ashbrook pulled into his neighbor's driveway.

Sergeant Boudinot jumped out of his cruiser and repeatedly screamed "let me see your hands." DVD: Ashbrook Traffic Stop (Vill. of Johnstown Police Dep't Feb. 25, 2007) (on file with Court). Ashbrook refused. Sergeant Boudinot approached the vehicle from the driver's side with his hand on his holster. He opened the door and twice demanded that Ashbrook "get out of the car." *Id*. Ashbrook refused. Sergeant Boudinot then grabbed him, pulled him to the ground, and tried to handcuff him. Ashbrook was uncooperative. He struggled and writhed on the pavement. Officer Gifford, arriving on the scene, saw the fracas and rushed to assist Sergeant Boudinot in subduing Ashbrook. The officers rolled Ashbrook onto his stomach, sat on his legs, and handcuffed him. During the struggle, Ashbrook alleges that the officers hurt his wrist.

The officers then pulled Ashbrook to his feet and escorted him to the police cruiser. The parties dispute what happened next. Ashbrook alleges that the officers slammed his head on the hood of the squad car. The officers counter that Ashbrook drunkenly lost his balance and fell forward as they brought him to the cruiser. It is undisputed that as the officers searched his car, Ashbrook unleashed tirades of verbal abuse. During the ride to the police station Ashbrook threatened "to kick [Sergeant Boudinot's] ass." *Id*. Ashbrook also yelled: "I'll f – ing kill you." *Id*.

Upon arriving at the police station, Sergeant Boudinot handcuffed Ashbrook to an eyebolt in the wall of the Blood Alcohol Content ("BAC") testing room. Ashbrook continued his belligerent behavior. He kicked the an electrical outlet, a trash can, and a wooden bench upon which detainees were supposed to sit. Ashbrook demanded that Sergeant Boudinot remove his cuffs. He begged: "my hands hurt." DVD: Ashbrook BAC Room (Vill. of Johnstown Police

Dep't Feb. 25, 2007) (on file with Court).  Sergeant Boudinot refused, explaining that "your hands hurt because you're standing up." *Id*.  Ashbrook continued to curse as Sergeant Boudinot left the BAC room.  Alone, Ashbrook's pugnacity did not abate.  With his heel, he kicked large holes in the wall.

Sergeant Boudinot returned and asked "do you want the stool back so you can sit down?" *Id*.  Ashbrook replied, "I said get the mother f–ing handcuffs off me." *Id*.  Ashbrook asked, "do you want me to keep it up?," referring to the holes in the wall.  *Id*.  Ashbrook continued, "I don't give a mother f–ing s– what you do!," and resumed kicking the wall. *Id*.  Sergeant Boudinot then threatened to mace him, and he stopped.  Ashbrook again pleaded "my hands hurt."  Sergeant Boudinot replied, "no wonder, you're standing up." *Id*.  Ashbrook then asked: "what am I supposed to do, lay on the mother f—ing floor?" *Id*.  Sergeant Boudinot pointed to the bench, stating "you had the bench here to sit on." *Id*.  Ashbrook cut him off: "I don't have no - - take the f–ing handcuffs off."  Sergeant Boudinot refused, and Ashbrook, irate, resumed kicking the wall.

Again, Ashbrook screamed: "my hands are numb." *Id*.  Sergeant Boudinot replied: "you can kick 'till you face turns blue, those cuffs are not coming off of you. You can scream bloody murder, I don't care." *Id*.  Sergeant Boudinot then told him to sit down.  "Where?" Ashbrook asked.  Sergeant Boudinot pointed to the bench.  Ashbrook said, "f— that bench," and reiterated his demand that the officer remove the handcuffs. *Id*.  Sergeant Boudinot refused and left the room.

Sergeant Boudinot returned to read Ashbrook his *Miranda* rights and unhooked his handcuffs from the eyebolt with Officer Gifford's assistance.  The officers escorted Ashbrook

from the room to a waiting cruiser. On the way out, Ashbrook alleges that the officers slammed his head into the wall. The officers contend that Ashbrook refused to leave the BAC room, and when they pulled him, he drunkenly stumbled into the door frame. On the way to the jail, Ashbrook, handcuffed in the back of Officer Gifford's cruiser, continued his belligerent bouts of cursing and threats, sprinkled with complaints about his handcuffs. Ashbrook then tried to kick through the window of the squad car, forcing Officer Gifford to strap his legs to the seat. In total, Ashbrook was handcuffed for a little over an hour.[1]

The State charged Ashbrook with vandalism, fleeing the police, resisting arrest, operating a motor vehicle while intoxicated, and carrying a concealed weapon. Ashbrook pleaded guilty to driving while intoxicated and vandalism. All of the other charges were dismissed. Thereafter, Ashbrook filed suit against Sergeant Boudinot and Officer Gifford under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment and Article I, § 14 of the Ohio Constitution. Ashbrook also brought a state tort claim against the officers for assault.[2] Defendants moved for summary judgment on all claims.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But

---

[1] Ashbrook alleged in his complaint that the officers stunned him with a tazer, but has since recanted this accusation. As such, it merits no further discussion.

[2] Ashbrook abandoned his claims against Defendants for false arrest, malicious prosecution, intentional infliction of emotional distress, and false imprisonment. Ashbrook also abandoned all claims against Defendants Police Chief Don Corbin and Johnstown Village Manager Sarah Phillips. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment with respect to these claims. Only Ashbrook's claims for excessive force and assault against Officer Boudinot and Officer Gifford will be considered here.

"summary judgment will not lie if the. . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 248. Therefore, the movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rest upon its mere allegations." Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324*; Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must instead present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). Where there is authentic and uncontroverted video evidence that utterly discredits a litigants' version of events such that there is no *genuine* issue of material fact, the Court should view the facts in the light depicted by the videotape. *Scott v. Harris*, – U.S. –, 127 S.Ct. 1769, 1776 (2007).

## IV. ANALYSIS

### A. § 1983 Claim for Excessive Force

Defendants assert qualified immunity as to Ashbrook's § 1983 claim for excessive force. Qualified immunity is an affirmative defense that a defendant state official may raise. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991). Government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has established an objective standard by which the Court must determine defendant officers' entitlement to qualified immunity. *See Harlow*, 457 U.S. at 818.

Accordingly, the Court must conduct a two-step analysis in adjudicating assertions of qualified immunity on summary judgment. *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004). First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right?" *Wilkie v. Robbins*, - - U.S. - -, 127 S. Ct. 2588, 2617 (2007). Second, the Court must "determine if the right was clearly established, such that a reasonable officer would have known that his conduct was unlawful." *Id.*; *see also Wilson*, 526 U.S. at 609; *Dunigan*, 390 F.3d at 491. Ultimately, the applicability of qualified immunity is a matter of law to be decided by the Court on the preponderance of the evidence. *See Hunter v. Bryant*, 502 U.S. 224, 537 (1991); *Crawford-El v. Britton*, 523 U.S. 574, 594 (1998).

The Fourth Amendment prohibits the use of excessive force by an arresting officer. *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (*citing Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). Allegations of excessive force require the Court to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As a result, the constitutionality of an officer's actions must be evaluated from "the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id*. The officer's underlying intent or subjective motivation is therefore irrelevant to an excessive-force claim. *Id*. at 397.

The inquiry reduces to whether the officer's actions are objectively reasonable in light of the facts and circumstances of the arrest, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396 (*citing Garner*, 471 U.S. at 8-9). This rubric "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006).

It is undisputed that Sergeant Boudinot had probable cause to stop and arrest Ashbrook on suspicion of driving while intoxicated. Ashbrook, however, contends that Sergeant Boudinot and Officer Gifford used excessive force on three occasions: (1) in arresting him; (2) in handcuffing him too tightly; and (3) in allegedly slamming his head into the wall while escorting him from the BAC testing room. Each will be addressed in turn.

### 1. Arrest

Ashbrook contends that the officers used excessive force in pulling him from his car, handcuffing him, and allegedly slamming his head on the hood of the police cruiser. Ashbrook argues that he stopped his vehicle and passively awaited Sergeant Boudinot's instructions. He avers that he did not flee, he did not reach for a weapon, and he did not offer any resistance. Ashbrook alleges that the routine nature of the traffic stop, his docility, and the fact that he posed no threat to the officers or to bystanders militated against the use of force. *See Graham*, 490 U.S. at 396. As such, Ashbrook concludes that the officer's application of force was unreasonable under the circumstances and a violation of his Fourth Amendment rights.

The video evidence belies Ashbrook's account of events. To begin with, Ashbrook

-7-

refused to pull over when Sergeant Boudinot turned on his cruiser's sirens and lights.  Sergeant Boudinot pursued Ashbrook for approximately two-and-a-half minutes, or four miles, before Ashbrook finally stopped.  Although it was not a high-speed chase, Ashbrook barely missed a guard rail, almost collided with Sergeant Boudinot's cruiser, and veered dangerously into the oncoming lane.

After he pulled over, Ashbrook was no more cooperative.  He refused Sergeant Boudinot's repeated requests both to put his hands in the air and to get out of his car.  For a police officer, approaching an uncooperative suspect in his vehicle is an uncertain, tense, and dangerous proposition.  Sergeant Boudinot had no idea whether Ashbrook's apparent defiance would escalate into violence.  Nor could the officer know whether Ashbrook had a weapon.  Further, Ashbrook had not exited the vehicle nor had he surrendered the keys.  Had he tried to flee, his vehicle would have been a danger to other motorists.  Under such circumstances, it is reasonable for an officer to pull an uncooperative suspect from his vehicle.  The Supreme Court has cautioned that courts must temper the excessive force inquiry with a "calculus of reasonableness [which] must embody allowance for the fact that police officers are often forced to make split-second judgments– in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396.  With minimal force, Sergeant Boudinot dragged Ashbrook from his car, diffusing a potentially dangerous situation.

Similarly, the officers did not use excessive force in handcuffing Ashbrook.  Although Ashbrook protests that he was neither fleeing nor resisting arrest, the recording shows him struggling on the ground, resisting the officer's attempts to handcuff him, and swearing

-8-

profusely. Although Ashbrook's resistance may not have been violent, neither was the degree of force used to subdue him. The officers did not strike, kick, knee, mace, stun, shoot, or otherwise harm Ashbrook. Rather, the officers applied no more force than was necessary to handcuff an uncooperative suspect. Fourth Amendment "jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof . . .." *Graham*, 490 U.S. at 396. In this case, the government's interest in neutralizing a belligerently drunk suspect merits the minimal application of force.

The evidence also undermines Ashbrook's allegation that the officers' slammed his head into the hood of the police cruiser. The video shows that, after handcuffing Ashbrook, the officers escorted him to Sergeant Boudinot's cruiser. The video shows that as the officers brought him to the car, Ashbrook lost his balance and fell forward onto the hood. Ashbrook did not hit the hood with great force and neither officer slammed his head into the cruiser. In sum, the officers applied a reasonable amount of force in arresting Ashbrook.

Ashbrook counters with a list of cases where courts denied qualified immunity to officers accused of using excessive force. But these cases all involved unmistakable police violence against cooperative suspects. *See Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994) (denying qualified immunity on an excessive-force claim where officers repeatedly maced plaintiff, even after he was incapacitated); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 897 (6th Cir. 2004) (officers maced, pepper-sprayed, kicked, and placed their body weight on a mentally ill plaintiff's chest cavity despite the fact that he was already handcuffed, resulting in his death from asphyxiation); *Alexander v. Newman*, 345 F. Supp. 2d 876, (6th Cir. 2004) (officers

savagely beat an unarmed and cooperative plaintiff); *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (officers continued to beat plaintiff after he had been neutralized); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (officers shoved a cooperative mother of six up against the wall, slammed her head into a display case, and broke her arm in front of her young children for reportedly taking them to an R-rated movie without buying tickets); *Bass v. Robinson*, 167 F.3d 1041, 1043 (6th Cir. 1999) (officers put plaintiff in a headlock and repeatedly slammed his head into a tree, resulting in injuries to his ear, head, neck, and back); *Graham*, 490 U.S. at 389 (officers tackled and beat a diabetic plaintiff suffering from low blood sugar, breaking his foot, bruising his head, injuring his shoulder, cutting his wrists, and damaging his ear); *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991) (officers tackled plaintiff from behind and placed him in an "extremely punishing pain compliance hold solely for accidentally bumping into a demonstrator's placard"); *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) (a mentally-ill plaintiff suffered a compression fracture in a lower vertebrate after police tackled him to the ground).

The contrast between these examples of police brutality and the conduct of Sergeant Boudinot and Officer Gifford is stark. Plaintiffs in these cases were cooperative. Ashbrook was belligerent. Officers in these cases applied extreme levels of force. The officers in this case did not mace, pepper-spray, asphyxiate, kick, stun, strike, or shoot Ashbrook. Plaintiffs listed above were sober. Ashbrook was intoxicated. Plaintiffs in these cases were injured. Ashbrook presents no direct or circumstantial evidence of any injury resulting from his arrest.

The Sixth Circuit has consistently held that a suspect's resistance justifies the application of minimal force to subdue and handcuff him. In *Anderson v. Antal*, No. 98-1657, 1999 WL

717993, at *2 (6th Cir. Sept. 7, 1999), plaintiff had been drinking, refused to immediately stop her car, and defied an officer's request to exit her vehicle.  The *Anderson* Court held that the arresting officer did not use excessive force in dragging plaintiff from her car, pushing her onto the hood of his cruiser, and handcuffing her.  *Id*.  Analogous fact patterns in which an officer's alleged conduct did not constitute excessive force are legion.  In *Burchett v. Kiefer*, 310 F.3d 937, 943-44 (6th Cir. 2002), the Sixth Circuit concluded that officers did not use excessive force when they tackled Burchett, wrestled his arms behind his back, and handcuffed him.  Burchett admitted that he "twisted and turned some," which indicated to the Court that some force was necessary to restrain him.  Even Burchett's wife, who witnessed the scene, conceded that he was "kind of jumping around."  *Id*. at 940.  The application of force in this case was even more appropriate given that Ashbrook was intoxicated and belligerent.

Likewise, in *Thacker v. Lawrence County*, 182 F.App'x. 464, 472 (6th Cir. 2006), the Sixth Circuit held that officers did not apply excessive force when they tackled, wrestled, and handcuffed an "upset, loud, and swearing individual who refused to calm down."  The *Thacker* Court noted that because plaintiff admitted to resisting, the deputies acted reasonably in restraining him.  *Id*.  *Thacker* closely tracks the facts of this case, except that where Thacker was sober, Ashbrook was inebriated.  *See also Monday v. Oullette*, 118 F.3d 1099, 1104-05 (6th Cir. 1997) (holding that the use of pepper spray to subdue an uncooperative and heavily intoxicated plaintiff did not constitute excessive use of force).  Given the minimal application of force in this case, despite the tense, uncertain, and potentially dangerous conditions under which the officers arrested Ashbrook, the Court concludes that their actions were reasonable under the circumstances.

*2. Excessively Tight Handcuffing*

Ashbrook further alleges that the tightness of his handcuffs constituted excessive force in violation of his Fourth Amendment rights.  The Sixth Circuit permits a plaintiff "to get to a jury upon a showing that officers handcuffed [him] excessively and unnecessarily tightly."  *Burchett*, 310 F.3d at 943-44.  To survive summary judgment Ashbrook must allege that: (1) his handcuffs were unduly tight; (2) the officers ignored his complaints; and (3) he sustained some physical injury as a result.  *See Kostrzewa v. Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (reversing a grant of qualified immunity on an excessive-force claim where plaintiff sustained serious injury as a result of tight handcuffing, despite plaintiff's repeated pleas to loosen them); *Martin v. Heidman*, 106 F.3d 1308, 1313 (6th Cir. 1997) (concluding that there was a genuine issue of fact as to excessive-force claim where plaintiff's hands were injured after thirty-five minutes in unduly tight handcuffs).

Ashbrook cannot satisfy these requirements.  First, Ashbrook proffers no direct or circumstantial evidence of any injury arising from the tightness of the handcuffs.  In *Kostrzewa*, plaintiff's wrists were "extremely swollen, red, and painful," requiring medical treatment and resulting in "severe, debilitating and permanent injuries to both wrists." 247 F.3d at 640. Plaintiff in *Martin* sustained "a fractured right clavicle . . . and permanent injuries to his right arm, elbow, hand, and shoulder."  106 F.3d at 1309.  Ashbrook's failure to allege any injury resulting from the handcuffs is fatal to his claim.  *See Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (holding that plaintiff's failure to allege injury torpedoed her excessive-force claim for unduly tight handcuffs); *Shelton v. Taylor*, 92 F. App'x. 178, 182 (6th Cir. 2004) (upholding qualified immunity on an excessive-force claim where plaintiff presented no

evidence of injury arising from handcuffing besides the mere assertion that his arm was broken); *Smith v. Athens County*, 79 F.App'x. 841, 844 (6th Cir. 2003) (holding that hospital notes describing redness around the wrists and elevated blood pressure as evidence of excessively tight handcuffs was insufficient to overcome qualified immunity).

Second, Ashbrook created the circumstances by which he suffered. Ashbrook did not complain of the tightness of the handcuffs at the time of his arrested or on route to the police station. He only complained after the officers affixed his handcuffs to the eyebolt in the BAC testing room.[3] Johnstown police officers routinely handcuff suspects, arrested on suspicion of driving while intoxicated, to the eyebolt in the wall of the BAC testing room in order to administer the Breathalyzer test. The officers typically provide a bench so that detainees can sit, ensuring that their handcuffs rest at the level of the eyebolt. If the detainee stands, the eyebolt is below hand level, pulling the handcuffs down and straining the detainee's wrists.[4] Although the officers provided Ashbrook with a bench, he kicked it over in a drunken tirade. His handcuffs, attached to the eyebolt, tightened because he had to stand. Had Ashbrook been sitting, the handcuffs would likely not have strained his wrists.

Ashbrook complained to Sergeant Boudinot that his hands were numb and that his wrists hurt. Although Sergeant Boudinot refused to loosen or remove the cuffs, he told Ashbrook that

---

[3]An eyebolt is a restraining device in which a detainee's handcuffs are affixed to a second pair of handcuffs that are attached to an iron ring jutting out from the wall.

[4]The eyebolt is affixed to the wall approximately three feet from the floor. For suspects of normal height, the eyebolt is below where their hands would rest if they were standing up. Therefore, officers typically provide a bench upon which detainees may sit. If the suspect sits, his hands rest at the level of the eyebolt. If the suspect stands, the eyebolt pulls down on the handcuffs, straining the suspect's wrists.

his wrists hurt because he was standing up, and that if he sat down on the bench, the handcuffs would not strain his wrists. Ashbrook responded with colorful admonitions, bouts of cursing, and threats. But he refused to let Sergeant Boudinot put the bench under the eyebolt, saying "f ---- that bench."

Accordingly, this case is distinguishable from *Kostrzewa* and *Martin*, where officers handcuffed plaintiffs too tightly upon arrest and refused to loosen the handcuffs despite numerous complaints of pain, numbness, and injury. *Meadows v. Thomas*, 117 F. App'x. 397, 405 (6th Cir. 2004) is more instructive. According to Meadows, his handcuffs were loose until the arresting officer placed him in the back of a police cruiser. *Id*. Thereafter, the handcuffs tightened, causing him pain and numbness. *Id*. He complained to the officers, to no avail. *Id*. Nevertheless, the Sixth Circuit found that the cause of "the increased tightness, if any, was . . . Meadows' own movements, or, at most, movement resulting from the vehicle." *Id*. The Court concluded that an excessive-force claim could not survive summary judgment merely "upon a showing that the handcuffs tightened or became very uncomfortable as a result of some action *other than the officer's* – or, as is likely in this case, a result of the plaintiff's own refusal to stop straining against the handcuffs." *Id*. Similarly, Ashbrook created the circumstances by which he suffered.

### 3. Exiting the BAC Room

Finally, Ashbrook alleges that the officers slammed his head into the wall upon exiting the BAC room. The video shows no such thing. Rather, the officers unclasped Ashbrook's handcuffs from the eyebolt to transport him to the county jail. They attempted to take his mugshot, but Ashbrook was uncooperative. The officers escorted Ashbrook to the doorway of

the BAC room at which point he stopped and appeared to resist the officers' efforts to move him. Sergeant Boudinot grabbed the lapel of Ashbrook's jacket and pulled him through the doorway. The video shows that Ashbrook fell forward, presumably into the doorframe or the hallway wall.

This incident does not amount to excessive force. Although not a flight risk and incapacitated by the handcuffs, Ashbrook was nevertheless uncooperative. The application of minimal force was therefore appropriate. Accordingly, Sergeant Boudinot pulled Ashbrook from the room. The amount of force was not unreasonable and Ashbrook proffers no evidence of injury as a result of this incident.

The excessive-force cause of action is an important deterrent to police misconduct, a touchstone of a detainee's Fourth Amendment protections. Government, "like fire, is a troublesome servant and a fearful master. Never for a moment should it be left to irresponsible action." George Washington, as quoted in *The Cry for Justice: An Anthology of the Literature of Social Protest*, Upton Sinclair, 305 (1915). But every drunken fall does not constitute a cognizable claim and not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396. The video evidence confirms that the officers applied a reasonable amount of force in arresting, detaining, and transporting Ashbrook. Because the Court does not find a constitutional violation, it is unnecessary to determine whether Ashbrook's rights were clearly established. As such, the officers are entitled to qualified immunity with regard to Ashbrook's § 1983 claim.

### B. STATE LAW CLAIMS

Ashbrook also alleges that the officers applied excessive force in violation of § 14, Art. I

of the Ohio Constitution. The Ohio Supreme Court has held that the Ohio Constitution affords the same protections as the Fourth Amendment and as such, the analysis is the same for state and federal excessive-force claims. *State v. Robinette*, 685 N.E.2d 762, 765 (1997). As no genuine issue of material fact exists as to Ashbrook's Fourth Amendment claim, none exists as to his claim for excessive force under the Ohio Constitution.

Similarly, because the amount of force used to arrest, detain, and transport Ashbrook was reasonable under the circumstances, Ashbrook cannot make out a claim of assault under Ohio law. It is well established that "state law claims for assault and battery rise and fall with [plaintiff's] Fourth Amendment excessive-force claim." *D'Agastino v. City of Warren*, 75 F. App'x. 990, 995 (6th Cir. 2003); *see also Magrum v. Meinke*, 332 F.Supp.2d 1071, 1083 (N.D. Ohio 2004). Only in cases where "excessive force is used, that is, force going clearly beyond that which is reasonably necessary to make the arrest, can such force be claimed an assault and battery by the person arrested." *Schweder v. Baratko*, 143 N.E.2d 486, 490 (Ohio S.Ct. 1957). Under Ohio law, the officers, acting in their official capacity, are immune from liability for injury for actions that are neither manifestly outside the scope of their responsibilities, malicious, in bad faith, wanton, nor reckless. Ohio Rev. Code § 2744.03(A)(6). Incorporating the analysis above, the Court concludes that the officers applied a reasonable amount of force under the circumstances. Therefore, the officers are entitled to qualified immunity under Ohio law with respect to Ashbrook's claim for assault.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment. This disposes of all of Plaintiff's claims before this Court.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: December 2, 2007**